Jonathan Corbett, Esq. (CA Bar No. 325608)
**CORBETT RIGHTS, P.C.**
5551 Hollywood Blvd., Suite 1248
Los Angeles, CA 90028
Phone: (310) 684-3870
FAX:   (310) 675-7080
E-mail: jon@corbettrights.com
*Attorney for Plaintiffs Jasmol Singh & Umit Bagga*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Jasmol Singh<br>-*and*-<br>Umit Bagga,<br>*Plaintiffs,*<br><br>*v.*<br><br>DEA Special Agent Heja Rosebiani,<br>DEA Special Agent Mark Carroll,<br>CHP Officer Jay Sides,<br>Fontana Police Officer Nelson Romero,<br>Unknown Fontana Police Officer 1,<br>-*and*-<br>Unknown Fontana Police Officer 2,<br>*Defendants* | Case No. 2:23-CV-5115<br><br>**COMPLAINT**<br><br>*JURY TRIAL DEMANDED* |

## Introduction

1.      Civil asset forfeiture was intended as a means of thwarting distributed criminal enterprises whose leaders may be outside of the jurisdiction or otherwise able to escape prosecution.  However, given that state and federal law as written today often allows law enforcement agencies to keep some or all of the assets seized, a perverse incentive is created for law enforcement officers to invent criminal conspiracies in their heads while ignoring all evidence to the contrary.  Seize first, justify later, disregard the innocent lives ruined by destroying small businesses or

appropriating one's life savings, and hope that the victims of their abusive practices cannot afford competent counsel or can be bullied into a "settlement."

2.      Plaintiffs will not be bullied any further.  In October 2021, a joint drug taskforce seized $200,000 from Plaintiffs Jasmol Singh and Umit Bagga's, arresting Singh in front of his customers in the process, and marking the culmination of four months of harassment.  These funds were the legitimate business proceeds of Plaintiffs' legitimate business of selling for export new and used cell phones, which the taskforce knew or should have known, but disregarded.

3.      Plaintiffs had their reputations besmirched, their business destroyed, and their civil rights violated.  In a separate case, Plaintiffs seek the return of their money.  In this action, Plaintiffs seek money damages from those who repeatedly violated their rights with unlawful searches and seizures, deceptive warrant applications, and utter disregard for whether they were targeting innocent people.

## Jury Demand

4.      Plaintiffs demand a jury trial on all issues so triable.

## Parties

5.      Plaintiff Jasmol Singh is a natural person residing in Los Angeles County, California, and is a partner in a business with ownership interest of the seized currency.

6.      Plaintiff Umit Bagga is a natural person residing in Los Angeles County, California, and is a partner in a business with ownership interest of the seized currency.

7.      Defendant DEA Special Agent Heja Rosebiani is an officer of the U.S. Drug Enforcement Administration ("DEA") who personally directed the unlawful acts committed against Plaintiffs.  She regularly works and, upon belief, lives, within the boundaries of the Central District of California and is sued here in her individual

capacity for constitutional violations pursuant to the framework established in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

8.      Defendant DEA Special Agent Mark Carroll is an officer of the U.S. Drug Enforcement Administration ("DEA") who personally directed the unlawful acts committed against Plaintiffs.  He regularly works and, upon belief, lives, within the boundaries of the Central District of California and is sued here in his individual capacity for constitutional violations pursuant to the framework established in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).

9.      Defendant CHP Officer Jay Sides is an officer of the California Highway Patrol who conducted an unlawful pretext stop and search of Plaintiff Singh.  He regularly works and, upon belief, lives, within the boundaries of the Central District of California and is sued here in his individual capacity for violation of rights under color of state law pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

10.      Defendant Fontana Police Officer Nelson Romero is an officer of the Fontana Police Department who seized the currency owned by Plaintiffs.  He regularly works and, upon belief, lives, within the boundaries of the Central District of California and is sued here in his individual capacity for violation of rights under color of state law pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

11.      Defendant Unknown Fontana Police Officer 1 is an officer of the Fontana Police Department who arrested Plaintiff Singh, and whose name is not yet known to Plaintiffs[1].  He regularly works and, upon belief, lives, within the boundaries of the Central District of California and is sued here in his individual

---

[1] Although Plaintiffs are in possession of the names of several law enforcement officers present at the time Plaintiff Singh was arrested, it is not currently known to Plaintiffs which law enforcement officer actually effected the arrest.  Plaintiffs note that it is possible that Defendant Fontana Police Officer Nelson Romero and Defendant Unknown Fontana Police Officer 1 are the same person.  Plaintiffs will amend their complaint with this officer's true identity as soon as discovery reveals it.

capacity for violation of rights under color of state law pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

12.     Defendant Unknown Fontana Police Officer 2 is an officer of the Fontana Police Department who searched Plaintiff Singh's car at the time of the currency seizure, and whose name is not yet known to Plaintiffs[2].  He regularly works and, upon belief, lives, within the boundaries of the Central District of California and is sued here in his individual capacity for violation of rights under color of state law pursuant to the Civil Rights Act, 42 U.S.C. § 1983.

## **Jurisdiction & Venue**

13.     The Court has federal question subject-matter jurisdiction over all causes of action brought herein pursuant to 28 U.S.C. § 1331.  The federal laws giving rise to the claims are 42 U.S.C. § 1983 and U.S. Const., Amend. IV.

14.     The Court has general personal jurisdiction over all defendants because they all regularly work and, upon belief, reside, within the State of California, and in the alternative, has specific personal jurisdiction over the same because their purposeful contacts within the state gave rise to the incident described in this complaint.

15.     The Court is a proper venue because this action is brought in a judicial district in which at least one defendant resides and all defendants are residents of the state in which this judicial district is located, pursuant to 28 U.S.C. § 1391(b)(1); in the alternative, the events or omissions giving rise to this complaint occurred within this judicial district pursuant to subsection (b)(2).

---

[2] Once again, it is possible that Defendant Fontana Police Officer Nelson Romero and Defendant Unknown Fontana Police Officer 2 are the same person, or that unknowns 1 and 2 are the same person, or all three.  Plaintiffs will amend their complaint with this officer's true identity as soon as discovery reveals it.

## Statement of Facts

16.     In or before July 2021, a joint law enforcement taskforce known as "TFG-2," consisting of officers of the DEA and local police officers, began investigating an individual named Pablo Flores whom they suspected was a drug trafficker, and his suspected associates.

17.     At various points in 2021, to further their investigation, they obtained a warrant (or extension of the same) to wiretap several cell phones suspected to be used by Flores and his suspected associates.

18.     Between July and October 2021, Plaintiff Singh was intercepted by TFG-2 several times discussing with Flores or his associates[3] the purchase and sale of cell phones, as well arranging to pick up cash payments.

19.     In fact, Singh and his partner, Plaintiff Bagga, had operated a business for years primarily involving the purchase of new and used phones in the United States for resale in emerging markets, such as Mexico.

20.     Scarcity of such devices in emerging markets results in premium pricing, even for devices that are slightly older models that, in the United States, may be of lesser value due to easy access to, and demand for, the latest models.

21.     Singh would generally purchase new phones directly from Apple.

22.     Singh would generally purchase used phones direct from consumers, using Craigslist (an online classified ads Web site) or similar means.

23.     Singh's business was conducted using a mix of cash, check, and electronic payments, and tens or hundreds of thousands of dollars of business were conducted using *each* of these three forms of payments in 2021.

---

[3] Plaintiffs do not know a man named Pablo Flores.  If they had ever spoken to Flores, Flores provided a false identity to Plaintiffs.  Because it matters not in this complaint, Plaintiffs adopt the government's position, taken in the civil forfeiture proceeding, that Flores or his associates were on the other end of these conversations.

24.     Buyers from emerging markets are traditionally more likely to use cash than American customers, even for large purchases, due to distrust of their banking systems, high transaction or currency exchange fees, or other reasons.

25.     Likewise, sellers on Craigslist traditionally demand cash due to the semi-anonymous nature of these transactions and the possibility of fraud (*e.g.*, if they accept a PayPal transaction, there is a risk that the transaction may be fraudulently reversed after the sale).

26.     It was, thus, reasonable and expected for Plaintiffs' business to conduct a significant portion of its business in cash and, suffice to say, all transactions overheard on wiretaps were for the legitimate sale of legitimate goods.

27.     At no time did law enforcement ever overhear any plaintiff referring to illegal drugs, money laundering, or any other illegal activity.

28.     At no time did Plaintiffs knowingly participate in any transactions for or in support of the drug trade, money laundering, or any other illegal activity.

29.     Notwithstanding the evidence at their fingertips that Plaintiffs were cell phone dealers, not drug dealers, TFG-2 decided to investigate Plaintiff Singh.

30.     However, instead of using legitimate, reasonable investigative techniques – interviews, surveillance, *etc*. – TFG-2 apparently decided it would be easier to "play dirty."

31.     Defendants DEA SA Heja Rosebiani and DEA SA Mark Carroll were the leaders of this investigation.

32.     At some point between July 8th, 2021 and July 28th, 2021, Rosebiani and Carroll directed[4] Defendant CHP Officer Jay Sides to follow Singh while he was driving, invent a reason to pull him over, and search his car.

---

[4] It is unclear if this direction was provided directly to Sides or was made through other officers who assigned the task to Sides; for the purposes of this complaint, it matters not.

33.     Upon belief, Rosebiani and Carroll chose this approach because they knew they did not have probable cause to obtain a warrant to conduct a search, and/or because it required less effort than conducting actual legitimate fieldwork.

34.     On or about July 28th, 2021, south of Los Angeles and within the district boundaries of this Court, Sides did, in fact, pull over Singh while he was driving.

35.     Sides approached Singh advised him that he was speeding.

36.     Singh was not, in fact, traveling in excess of the speed limit.

37.     Sides knowingly used this false allegation of speeding as a pretext to stop Singh's vehicle.

38.     During the stop, Sides questioned Singh and his passengers.

39.     Sides asked Singh for consent to search his vehicle, which he provided.

40.     Sides and/or fellow officers conducted a roadside search.

41.     No drugs, money, or other evidence of criminality were found, and a drug dog alert was negative.

42.     However, approximately 100 cell phones were found.

43.     Uninterested in cell phones, but undeterred by finding nothing of interest, Sides towed Singh's vehicle back to a CHP station for further examination.

44.     Additionally, Sides placed Singh in handcuffs before transporting him and, upon arrival at the station, directed him to wait.

45.     Sides and/or fellow officers conducted a thorough search of the vehicle at the station.

46.     Nothing of significance but cell phones were found.

47.     Approximately two hours after he was handcuffed, and approximately four hours after the pretext stop was initiated, Singh was uncuffed and told he was free to go.

48.     Apparently out of ideas, upon information and belief, Rosebiani and Carroll took no further steps in their investigation of Singh for the next month-and-a-half.

49.   On September 11th, 2021, Plaintiff Singh was again recorded speaking with Flores or his agents about a cash payment via a wiretap on Flores' phone.

50.   Despite having no more evidence than they had in July, and indeed now possessing the exculpatory evidence of a vehicle free of drugs and cash but replete with cell phones, TFG-2 decided to obtain a warrant to directly wiretap Singh's phone.

51.   However, merely speaking to a suspected drug trafficker about a cash payment is not probable cause sufficient to obtain a warrant because there must be a means of determining if the payment was for legal goods and services.

52.   To get around this, Carroll authored a wiretap application package that deceptively lumped the request to wiretap Singh's phone in with two other individuals – Flores and "Tony" – for whom the government had ample probable cause, and further supported the application with claims that, at least as to Singh, are false and Carroll had no reason to believe were true.

53.   Carroll's affidavit in support of the wiretap application is attached as Exhibit A.

54.   The evidence presented in the affidavit supporting the wiretap against Flores was well-founded via field surveillance of prior drug deals:

a.   "[I]nvestigators observed [Flores] meet with the user of (951) 783-[XXXX] and deliver two (2) heavily weighted boxes to her (UF4702). Based on intercepted communications, [Flores] confirmed the delivery of $900,000.00 of illicit narcotics proceeds."

b.   "[I]nvestigators observed [Flores] and UM4894 meet which was supported by intercepted communications. Investigators continued mobile surveillance on UM4894 [...and...] eventually made contact with UM4894, and during a search of a residence, located approximately 19 kilograms of cocaine and $22,000.00 of illicit narcotics proceeds."  Ex. A., p. 36, ¶ 57.

55.    The evidence presented in the affidavit supporting the wiretap against "Tony" was well-founded via facts establishing that the price of a kilogram of cocaine in Southern California is typically $22,000 - $28,000 (Ex. A, p. 17, ¶ 24), and then the following wire intercept (Ex. A, pp. 22, 23, ¶ 36):

> "TONY asked how much it (narcotics) was going for over where Pop Smoke's cousin was (New York). PABLO said it (price) was at 30 ($30,000) and the people there sold it at 33 ($33,000). PABLO said that dude gave them (narcotics) to his (dude's) people at 29 ($29,000) or at 30 ($30,000). PABLO said they (narcotics) were between 32 ($32,000) and 33 ($33,000). TONY said he (TONY) thought that he (PABLO) had some (narcotics) up there (New York) already. PABLO said no and said he went to get them (narcotics) from down there (California). PABLO said he got them (narcotics) at the price from Los Angeles (California), and he took care of his own transportation. TONY said okay. TONY said he (TONY) misunderstood. PABLO asked many TONY wanted. TONY said he (TONY) wanted about 10 (units of narcotics) up there."

56.    However, the entirety of the evidence provided by Carroll as to Plaintiffs' participation in drug trafficking was a single phone call in which Singh was to receive "80" (presumably, $80,000) from Flores (Ex. A, p. 21, ¶ 34):

> "PABLO said he (PABLO) was calling regarding 80 ($80,000) "documents" (money).   [Singh] asked if PABLO said 60 ($60,000). PABLO said it was for 80 ($80,000). [Singh] asked if PABLO spoke English. PABLO asked what area [Singh] was in. [Singh] told PABLO to send his location. PABLO said he (PABLO) just received UM4860's information and was busy in Santa Monica (California) right now. PABLO said he (PABLO)

did not have it (money) on his person. [Singh] said okay. [Singh] asked again if PABLO spoke English or not. PABLO said he (PABLO) did speak English."

57.     In order to supplement this obviously deficient basis for obtaining a warrant, Carroll added in multiple conclusory statements for which he had no reason (other than Singh receiving a payment) to believe:

    a. "During this narcotics investigation, [Singh] coordinates the transportation and distribution of illicit narcotics proceeds derived from the sale of multi-kilogram loads of cocaine on behalf of the DTO. [Singh] is a narcotics associate of [Flores]." Ex. A, p. 9, ¶ 14(b).

    b. "[Singh's Phone], [Tony's Phone], and [Flores' Phone] is/are being utilized to facilitate the transportation and distribution of multi-kilogram loads of cocaine, multi-pound loads of methamphetamine, and/or the illicit narcotics proceeds derived from the sale…" Ex A., p. 12, ¶ 16(g).

    c. "During this narcotics investigation, RDO TFG-2 investigators identified cellular telephone number [Singh's Phone Number] is being used to facilitate the criminal activities of the Drug Trafficking Organization (DTO)…" Ex. A, p. 20, 21, ¶ 33.

58.     Carroll then further lied in his affidavit regarding "necessity and exhaustion," required under California law before a wiretap warrant shall issue.

59.     For example, Carroll stated: "Based on the complexity and sophistication of the DTO, there is no other way to infiltrate and understand the inner structure and dynamic of the DTO without the interception of the wire or electronic communications over [Singh's Phone]." Ex. A, p. 32, ¶ 48.

60.     But, upon information and belief, no interviews, surveillance, or other field work was even attempted (beyond the illegal pretext stop from July).

61.    Carroll also stated: "During this narcotics investigation, the Target Telephone(s) have been intercepted communicating with members of the DTO residing and operating in Mexico. … Therefore, there is no other possible means of infiltrating the DTO's Mexico-based-narcotics suppliers without the use of an electronic intercept on the Target Telephones…"

62.    But, at least as to Singh, this was not true at all: the government has never intercepted Singh speaking to a cartel member in Mexico.

63.    Nor has any plaintiff ever been intercepted speaking to any other alleged drug trafficker besides Flores.

64.    In short, at worst, one of Plaintiffs' cell phone customers was (unbeknownst to them) a drug dealer and neither Rosebiani, Carroll, or any other government official was in possession of any reason to think otherwise.

65.    Based on Carroll's misleading lumping of Singh in with Flores and "Tony," together with his false conclusory statements that Singh is known to coordinate drug deals, that Singh is known to work with the cartels, that Singh communicates to cartel members internationally, and that there was no other way to continue their investigation but via use of a wiretap, the warrant was approved by a judge.

66.    Notwithstanding, TFG-2 got from their new wiretap nothing but more of the same: conversations about cell phones and payments for the same.

67.    Over the next month of wiretapping Singh's phone, in addition to the previous four months where Singh was occasionally overheard speaking to Flores or his associates, at no point did the government ever overhear Singh mention drugs, money laundering, or any illegal activity whatsoever, whether using coded or plain language.

68.    Eventually, using their illegally-obtained wiretap, TFG-2 came to learn that Plaintiffs were to receive a larger cash payment, and decided that this would be their opportunity to seize some money.

69.     On October 8th, 2021, TFG-2 dispatched non-taskforce Fontana Police Officers, including Defendants Fontana Police Officer Nelson Romero, Unknown Fontana Police Officer 1 ("UFPO1"), and Unknown Fontana Police Officer 2 ("UFPO2"), to seize the cash payment.

70.     On that date, Romero, UFPO1, and UFPO2 did stop two individuals bringing that cash payment to Plaintiffs.

71.     Romero, UFPO1, and UFPO2 did not have probable cause or a warrant to stop these individuals, search their vehicle, or seize the cash.

72.     Romero personally conducted the seizure of the cash.

73.     UFPO1 personally placed Singh in handcuffs, in front of Singh's shocked customers and employees at his family business[5].

74.     UFPO1 did not have probable cause or a warrant to arrest Singh.

75.     One of the Fontana Police Officers present on the scene took possession of Singh's car keys.

76.     Singh did not consent to the taking of his car keys, nor a search of his vehicle.

77.     Singh was not in or near his vehicle at the time he was placed in handcuffs.

78.     UFPO2 did not have probable cause that Singh's car contained evidence of a crime, and were not otherwise lawfully authorized to search Singh's car.

79.     Notwithstanding, UFPO2 searched Singh's car.

80.     No contraband or cash was found.

81.     After questioning all three arrested individuals and seizing the cash, Romero, UFPO1, and UFPO2 allowed all individuals to leave.

---

[5] In addition to his cell phone company, Plaintiffs own a restaurant, which is where the seizure took place.

- 12 -

82. If there were probable cause to seize the cash, there would necessarily have been probable cause that these three individuals were committing a felony.

83. Upon belief, Romero, UFPO1, UFPO2, and TFG-2 allowed all three individuals to leave without charges because under civil forfeiture laws, the law enforcement agency would be able to keep a greater percentage of the cash seized.

84. In other words, it is indisputable that one of the two is true:

   a. The defendants believed they were dealing with drug dealers and/or money launderers, and had probable cause of the same, but chose not to arrest them.

   b. The defendants knew they had insufficient evidence that they were dealing with drug dealers and/or money launderers, but conducted unlawful searches and seized the cash anyway knowing that Plaintiffs will have to fight for its return.

85. The cash, in actuality, was payment for $200,000 worth of cell phones that had already been shipped to a buyer.

86. If the source of any of that $200,000 was illegal activities, Plaintiffs had no knowledge of the same, and were not participants in any illegal activities: they merely sell cell phones.

87. Likewise, Plaintiffs had no reason to know if any of the $200,000 was sourced from illegal activities.

88. Plaintiffs, scared and without the capital necessary to continue their business, were forced to discontinue doing business shortly after the seizure.

89. Plaintiffs experienced emotional distress as a result of being publicly shamed, handcuffed, and abused, and as a result of the loss of their business and, effectively, their life savings.

90. Plaintiffs also experienced other negative consequences as a result of Defendants' illegal conduct:

a. Plaintiffs' business bank account with Chase Bank was closed. Upon information and belief, this was the result of the bank receiving a letter from the DEA subpoenaing their bank records which caused the bank to believe the government had marked them as drug dealers.

b. The U.S. Department of Homeland Security has suspended Plaintiff Singh's trusted traveler program membership.

c. Plaintiffs were paying for extremely costly care of their[6] elderly, dying mother. As a result of the seizure of their cash, Plaintiffs were unable to continue paying for that care. Plaintiffs' mother passed away shortly thereafter[7].

## **Claims for Relief**

## **Count 1 – Violation of 42 U.S.C. § 1983 via Fourth Amendment**

### *Against Defendant CHP Officer Jay Sides*

91.     Singh has a right under the Fourth Amendment to the United States Constitution to be free from being detained without probable cause or warrant.

92.     By conducting a pretext stop, pretending that there was a lawful reason to pull over Singh when there was not, Sides violated that right and any "consent" obtained thereafter was invalid.

93.     Even if there had been a lawful reason to stop Singh, and even if Singh had consented to the initial search, by transporting Singh to a police station and handcuffing him, Sides violated Singh's Fourth Amendment rights.

94.     Sides was acting under color of state law.

---

[6] Plaintiffs are brother and sister.

[7] Plaintiffs do not allege that their mother would not have died but for Defendants' acts; however, Plaintiffs do allege that their mother may have lived longer and/or more comfortably but for those acts, and Plaintiffs experienced emotional anguish from not being able to provide their beloved mother the best possible care at the end of her life.

95.     Sides acted with intent to unlawfully arrest Singh.

96.     Singh was conscious of the confinement at all times and, reasonably, believed that he was not free to go.

97.     Singh did not consent to be handcuffed and detained.

98.     Accordingly, Sides is liable to Singh under 42 U.S.C. § 1983.

### Counts 2-3 – Fourth Amendment Unlawful Seizure

*Against Defendants DEA SA Heja Rosebiani & DEA SA Mark Carroll*

99.     Plaintiffs reference and re-allege ¶¶ 91 – 97.

100.    When Rosebiani and Carroll ordered the pretext stop of Singh, they understood and either intended or consciously disregarded the near certainty that Singh's rights would be violated in the process.

101.    By ordering another to violate Singh's rights, Rosebiani (Count 2) and Carroll (Count 3) are liable for that violation pursuant to the framework of *Bivens*.

### Count 4 – Violation of 42 U.S.C. § 1983 via Fourth Amendment

*Against Defendant Fontana Police Officer Nelson Romero*

102.    Singh has a right under the Fourth Amendment to the United States Constitution to be free from seizure of his property without probable cause or warrant.

103.    Romero did seize property – $200,000 cash – belonging to Plaintiffs.

104.    Romero had neither probable cause nor a warrant.

105.    Romero was acting under color of state law.

106.    Romero acted with intent to unlawfully seize Plaintiffs' property.

107.    Accordingly, Romero is liable to Singh under 42 U.S.C. § 1983.

**Count 5 – Violation of 42 U.S.C. § 1983 via Fourth Amendment**

*Against Defendant Unknown Fontana Police Officer 1*

108.    Singh has a right under the Fourth Amendment to the United States Constitution to be free from being detained without probable cause or warrant.

109.    UFPO1 did arrest Singh.

110.    UFPO1 had neither probable cause nor a warrant to arrest Singh.

111.    UFPO1 was acting under color of state law.

112.    UFPO1 acted with intent to unlawfully arrest Singh.

113.    Singh was conscious of the confinement at all times and, reasonably, believed that he was not free to go.

114.    Singh did not consent to be handcuffed and detained.

115.    Accordingly, UFPO1 is liable to Singh under 42 U.S.C. § 1983.

**Count6 – Violation of 42 U.S.C. § 1983 via Fourth Amendment**

*Against Defendant Unknown Fontana Police Officer 2*

116.    Singh has a right under the Fourth Amendment to the United States Constitution to be free from search without probable cause, warrant, or exception to the warrant requirement.

117.    UFPO2 did search Singh's vehicle.

118.    UFPO2 had neither probable cause nor a warrant to search Singh's car.

119.    The search cannot be considered a lawful search incident to arrest because Singh was nowhere near his vehicle at the time he was handcuffed.

120.    UFPO2 was acting under color of state law.

121.    UFPO2 acted with intent to unlawfully search Singh's property.

122.    Singh did not consent to the search.

123.    Accordingly, UFPO2 is liable to Singh under 42 U.S.C. § 1983.

## **Prayer for Relief**

WHEREFORE, Plaintiffs pray that the Court order the following relief:

i.  Actual damages, jointly and severally against all defendants, in the amount of $2,500,000, for loss of liberty, unlawful search, and garden-variety emotional distress;

ii.  Punitive damages in the amount of $5,000,000 against all defendants, jointly and severally, for their intentional violation of Plaintiffs' rights;

iii.  Reasonable attorney's fees;

iv.  Cost of the action;

v.  Interest as allowed by law; and

vi.  Any such further relief as the Court deems proper.

Dated:     Los Angeles, CA                    Respectfully submitted,

            June 27th, 2023

                                    _____*/s/Jonathan Corbett*_____
                                    Jonathan Corbett, Esq. *(CA Bar 325608)*
                                    **CORBETT RIGHTS, P.C.**
                                    5551 Hollywood Blvd., Suite 1248
                                    Los Angeles, CA 90028
                                    Phone: (310) 684-3870
                                    FAX:  (310) 675-7080
                                    E-mail: jon@corbettrights.com